Minute Order Form (06/97)

## United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 7420 | **DATE** | October 23, 2000 |
| **CASE TITLE** | Alan Newman  v  Unum Life Ins. Co. of America | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to] ☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Memorandum opinion and order entered. Accordingly, plaintiff's motion for summary judgment is granted, and defendant's cross motion is denied. Defendant is ordered to pay plaintiff the benefits defendant unreasonably withheld, as well as all of plaintiff's reasonable attorney fees.
(11) ☐ For further detail see order attached to the original minute order.

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| X | Notices mailed by judge's staff. | | | |
| | Notified counsel by telephone. | | OCT 2 4 2000  date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | FILED FOR DOCKETING  00 OCT 23 PM 1: 24 | docketing deputy initials | 16 |
| | Copy to judge/magistrate judge. | | | |
| GDS  courtroom deputy's initials | | | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ALAN NEWMAN, )
)
Plaintiff, )
)
v. ) No. 99 C 7420
)
) Judge Robert W. Gettleman
UNUM LIFE INSURANCE COMPANY OF )
AMERICA, )
)
Defendant. )

DOCKETED
OCT 2 4 2000

## MEMORANDUM OPINION AND ORDER

Plaintiff Alan Newman has filed suit under the Employment Retirement Income Security Act of 1974 ("ERISA"), specifically 29 U.S.C. §1132(a)(1)(B), to recover benefits denied him by defendant UNUM Life Insurance Company of America under the long-term disability policy ("the policy") held by plaintiff's previous employer, Humana, Inc. The parties have filed cross motions for summary judgment arguing that there is no genuine issue of material fact as to whether defendant properly denied plaintiff's claim under the policy. For the reasons set forth below, plaintiff's motion is granted and defendant's motion is denied.

### Facts

The facts in this case are simple. Plaintiff began working as a primary care physician and internist for Humana on July 15, 1995. In June of 1997, plaintiff's mother passed away and he began suffering work stresses as a result of a significantly increased work-load. In December 1997, due to anxiety, depression, and other behavioral symptoms caused by those stresses, plaintiff began consulting with Ms. Lenore Chavis ("Ms. Chavis"), a clinical social worker who holds a bachelors and masters degree in social work but who had not maintained a practice in

social work since 1994. In late 1997, plaintiff requested and was granted a vacation period from February 20, 1998, to March 3, 1998.

On February 19, 1998, after plaintiff had worked a full day, he was informed by letter that his employment agreement with Humana, which was set to lapse July 1, 1998, would not be renewed. The letter further stated that, "With this in mind, to ease the transition, we are releasing you from your clinical responsibilities effective immediately. You will continue to be paid through your termination date of July 1, and will be eligible for extension of your benefits through the COBRA program." Upon receiving this letter and being confronted by a colleague who allegedly made a disparaging remark to plaintiff, he lapsed into a severe depression and has been unable to work since.

From the time of these events through May of 1998, plaintiff continued to consult Ms. Chavis regarding his depression. On May 26, 1998, plaintiff began seeing psychiatrist Dr. Alan Ravitz ("Dr. Ravitz") on a regular basis. Dr. Ravitz prescribed numerous psychotropic drugs to treat plaintiff's ongoing depression. On May 26, 1998, plaintiff began seeing psychiatrist Dr. Alan Ravitz ("Dr. Ravitz") on a regular basis. Dr. Ravitz prescribed numerous psychotropic drugs to treat plaintiff's ongoing depression. Plaintiff later applied for and was given disability benefits from the Social Security Administration. On September 28, 1998, plaintiff filed a claim for long-term disability benefits under the policy with defendant. In his claim, plaintiff stated and Dr. Ravitz confirmed that plaintiff had been unable to work since February 20, 1998, and that he had been under the regular care of Dr. Ravitz since May of 1998.

Plaintiff's claim was formerly denied by defendant on October 19, 1998. On December 13, 1998, plaintiff sent a letter to defendant seeking review of his denial. Along with

his request for review, plaintiff supplied defendant with copies of his Social Security Administration finding of his disability, as well as his pay stub which showed payment through the end of his vacation period on February 28, 1998. Plaintiff's second review ended with another denial on January 6, 1999. On March 28, 1999, plaintiff again sought review of his denial. This time plaintiff provided defendant with a report prepared by forensic psychiatrist Dr. Henry Conroe ("Dr. Conroe"), which concluded that, upon examination of plaintiff, and review of the evidence (including an interview with Ms. Chavis), the date of onset for plaintiff's disability was indeed February 19, 1998. That review by defendant ended with yet another denial on November 8, 1999. Plaintiff subsequently filed this lawsuit.

In sum, the grounds upon which defendant relied in denying plaintiff's claim and later upholding that denial were: (1) on the evening of February 19, 1998, when plaintiff became disabled, he was no longer an active employee of Humana and therefore he was not covered by the policy; and (2) plaintiff failed to show that he was receiving regular medical care for his disability as of the day he became disabled, as required by the policy.

## Summary Judgment Standard

A movant is entitled to summary judgment when the moving papers and affidavits show there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Unterreiner v. Volkswagen of America, Inc., 8 F.3d 1206, 1209 (7th Cir. 1993). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Stewart v. McGinnis, 5 F.3d 1031, 1033 (7th Cir. 1993). Where, as here, cross-motions for summary

judgment are filed, the court must adopt a dual perspective. Stimsonite Corp. v. Nightline Markers, Inc., 33 F. Supp. 2d 703, 705 (N.D. Ill. 1999). Having adopted such a dual perspective, the court finds that the undisputed facts show that plaintiff is entitled to summary judgment.

## **Discussion**

The parties dispute the appropriate standard of review this court should apply to plaintiff's claim under 29 U.S.C. §1132(a)(1)(B) of ERISA. In Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989), the Supreme Court addressed this very issue, finding that cases such as the instant one are, "to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." In an attempt to clarify conflicting law in this circuit, the Seventh Circuit recently set forth "safe harbor" language that, once included in ERISA plans, would make clear that the plan intended for the administrator or fiduciary to have the discretionary authority referred to by the Supreme Court in Firestone. See Herzberger v. Standard Ins. Co., 205 F.3d 327, 329-332 (7th Cir. 2000). That "safe harbor" language is: "Benefits under this plan will be paid only if the plan administrator decides in his discretion that the applicant is entitled to them." Id. at 331. The Herzberger court refrained from making this language mandatory, however, since courts have consistently held that there are no "magic words" determining the scope of judicial review of decisions to deny benefits. Id. at 331. Nonetheless, the court held that, "the stipulation must be clear" since "employees are entitled to know what they're getting into." Id. at 332-333.

In the instant case, the policy states that, "When making a benefit determination under the policy, UNUM has discretionary authority to determine your eligibility for benefits and to

4

interpret the terms and provisions of the policy." The policy also states, "How does UNUM define disability? You are disabled when UNUM determines that. . . ." The court finds this language sufficiently clear to inform plaintiff that the administrator would have discretionary authority to determine eligibility for benefits and to construe the terms of the plan. See also Michigan Affiliated Healthcare Sys. v. Unum Life Ins. Co. of Am., 1997 U.S. Dist. LEXIS 14123 (W.D. Mich. Aug. 22, 1997) (reaching the same conclusion based on the same language, though by agreement of the parties).

Plaintiff argues further that because the policy gives discretion to defendant (the administrator of the plan) to determine what qualifies as a disability and to interpret its own terms, defendant is operating under a conflict of interest, and that conflict must be weighed as a factor in determining whether there is an abuse of discretion. See Firestone, 489 U.S. at 115. In assessing whether a conflict of interest exists, however, the Seventh Circuit has held that arguments of an inherent conflict, like the one plaintiff makes, are insufficient to show actual bias. See Mers v. Marriott Int'l Group Accidental Death & Dismemberment Plan, 144 F.3d 1014, 1020 (7th Cir. 1998), cert. denied, 525 U.S. 947 (1998)). Instead, plaintiff must provide specific evidence of actual bias, which he has failed to do in the instant case. See id. at 1020. Consequently, the court reviews defendant's decision to deny plaintiff's long-term disability benefits using the "arbitrary and capricious" standard.

Under the arbitrary and capricious standard, the court is permitted to set aside defendant's denial of benefits if that denial was based on an unreasonable interpretation of the plan documents. See id. at 1021. In the instant case, defendant's denial of benefits was based on just that. When interpreting the policy, defendant not only took portions of the policy out of context

5

and assigned meaning to them that is not supported by the text of the policy, defendant also disregarded salient portions of the policy. Because it resulted from defendant's unreasonable interpretation of the policy, defendant's decision to deny plaintiff's benefit claim was completely unreasonable. See id.

I. Defendant's first ground for denying plaintiff's claim

First, defendant claims that plaintiff was not covered by the policy on February 19, 1998, because he was not actively employed once he received the letter from Humana.[1] The policy states, "Your coverage . . . ends on the earliest of: . . . the last day you are in active employment except as provided under the covered layoff or leave of absence provision." In turn, "active employment" under the policy means "you are working for your Employer for earnings that are paid regularly and that you are performing the material and substantial duties of your regular occupation. You must be working at least the minimum number of hours as described under the Eligible Group(s) in each plan. Normal vacation is considered active employment." Taking all of this into consideration, the court finds two possible reasonable conclusions based on this language, both of which work in plaintiff's favor.

It is uncontested that plaintiff received earnings under his employment agreement with Humana through July 1, 1998. Accordingly, plaintiff was being paid regularly on February 19,

---

[1] In making this argument, defendant refers to the letter plaintiff received from Humana on February 19, 1998, as his "termination" letter, arguing that plaintiff's employment ceased the moment he read that letter. This is not so. Plaintiff remained employed by Humana through July 1, 1998. The most one can say about the February 19, 1998, letter is that it informed plaintiff that his employment agreement would not be renewed in July and also that plaintiff was relieved of his clinical responsibilities effective immediately.

1998. Further, defendant does not contest that plaintiff performed the material and substantial duties of his regular occupation that day or that he did so for more than 30 hours during that week.[2] Thus, the first reasonable conclusion based on the language in this portion of the policy is that plaintiff was covered under the policy on the evening of February 19, 1998, because he was still working for his employer for earnings that were paid regularly and he did perform the material and substantial duties of his regular occupation that day and that week.

The second reasonable conclusion defendant could reach is that plaintiff was still covered under the policy on the evening of February 19, 1998, because when he ceased working that day his pre-approved and long-planned vacation period began. Consequently, when plaintiff was informed at the end of his workday that his employment agreement would not be renewed in July of 1998, and was subjected to disparaging remarks by his colleague, his vacation period had begun. Under the policy, "normal vacation is considered active employment." Thus, at the time plaintiff became disabled, he was still an active employee of Humana under the policy because his normal vacation period continued through February 28, 1998.[3]

---

[2] Humana employees were covered under the policy only if they worked at least 30 hours per week. February 19, 1998, was a Thursday, and plaintiff worked each day that week. The court's conclusion that plaintiff worked at least thirty hours that week is based on the fact that the record demonstrates that he was preparing to begin his allotted vacation that night in addition to meeting the demands of his normal heavy workload.

[3] Defendant argues that when plaintiff was informed that he was released from his clinical responsibilities "effective immediately," what would have otherwise been a "normal vacation" under the policy was suddenly not so. Defendant argues that, because Webster's dictionary defines "vacation" as "a period of exemption from work" which "connotes a span of time having a distinct beginning and end," plaintiff's vacation was not normal under the terms of the policy. What defendant misses, however, is the fact that plaintiff's vacation did have a distinct beginning and end: it began on February 20, 1998, and it continued through February 28, 1998. Plaintiff does not assert that up until July 1, 1998, he was still employed by Humana but on vacation; instead, he counts only the days off that had been pre-approved by Humana. The only thing

7

Both of these conclusions lead to the same finding: plaintiff was still covered under the plan at the time he became disabled. In contrast, defendant's interpretation is completely unreasonable. Defendant argues that at the very second plaintiff learned that his employment contract would not be renewed, he was no longer an active employee and therefore not covered under the plan. Defendant reasons that, "[s]ince [plaintiff's] job duties ended on February 19, 1998, his active employment ended on that date, regardless of whether he continued to receive a salary after that date." In reaching this conclusion, defendant disregards the fact that plaintiff performed the material and substantial duties of his regular occupation that week and that day, and also the fact that normal vacation is considered active employment under policy. The uncontested facts establish that there was a seamless transition from the end of plaintiff's workday on February 19, 1998, into his two week vacation period that ended February 28, 1998. Consequently, plaintiff was covered by the policy until that date.

Defendant urges the court to follow the holdings of <u>Roeder v. Chemrex Inc.</u>, 863 F. Supp. 817 (E.D. Wis. 1994) and <u>Moffitt v. Whittle Communications, L.P.</u>, 895 F. Supp. 961 (E.D. Tenn. 1995). In <u>Roeder</u>, the plaintiff attempted to obtain disability benefits despite resigning from his employment position in 1991 and not becoming disabled until November of 1992. <u>Id</u>. Although the plaintiff in <u>Roeder</u> claimed that he was ready and able to perform full-time work for his employer should the need arise, the court was not convinced that the plaintiff was actively employed under the terms of the policy since he had actually performed employment duties only in a few "minor and isolated instances" after he resigned. <u>Id</u>. at 827. Likewise, the plaintiff in

---

abnormal about plaintiff's vacation in this instance was that, when it was over, he did not have to resume his clinical responsibilities for his employer.

Moffitt became disabled nine months after his active employment ended. 895 F. Supp. at 964-966. The court in Moffitt rejected the plaintiff's assertion that his employer had authority to extend plaintiff's coverage under the policy, finding instead that defendant properly denied the claim. Id. at 969. Both Roeder and Moffitt are distinguishable from the instant case in two crucial respects. Unlike the plaintiffs in those cases, plaintiff was not injured months after he ceased active employment for Humana. In fact, it was just minutes after plaintiff had completed a full work day and a full work week that he suffered the onset of his disability. Further, the plaintiffs in Roeder and Moffitt were not on normal vacation at the time they became disabled, like plaintiff in the instant case. As a result, the holdings of Roeder and Moffitt are inapposite.

Finally, defendant vaguely asserts that plaintiff's disability arose sometime after February 19, 1998, by quoting the physician statement that Dr. Ravitz submitted along with plaintiff's disability claim. The portion defendant quotes states: "[patient] was unexpectedly terminated. Became increasingly depressed subsequent to this event." Defendant has taken this statement out of context, however, since it was submitted in response to the question, "[i]s the patient's condition work related?" Thus, Dr. Ravitz's answer does not address when plaintiff became disabled. In fact, Dr. Ravitz indicated on the form that plaintiff's symptoms first appeared in "2-98" and he was first unable to work in "2-98." Since the court has found that plaintiff was covered by the policy through February 28, 1998, which was the last day of that month, it does not matter which day in February of 1998 that Dr. Ravitz was referring to when he wrote "2-98" in response to these questions. The result is the same: plaintiff was covered by the policy when he became disabled.

9

Moreover, defendant unreasonably interprets Dr. Ravitz's statement that plaintiff became "increasingly depressed" after February 19, 1998, to mean that plaintiff did not become disabled on that day. Dr. Ravitz did not write that plaintiff "became depressed" subsequent to that day; he wrote that plaintiff "became increasingly depressed" after that day. The fact that an already debilitating mental illness worsened subsequent to its onset does not mean that it was not debilitating to begin with.

Further, in the notes submitted along with Dr. Ravitz's physician statement, Dr. Ravitz lists several of the other causes of stress that contributed to plaintiff's illness. Dr. Ravitz wrote: "mom died 6-26-97[,] then had oral surgery[,] then problems at work . . ." followed by an in-depth discussion of the problems plaintiff had at work prior to his termination. Of course, even if it were true that plaintiff's receipt of the letter from Humana was the sole cause of his debilitating depression, he would still be covered under the policy. The policy defines mental illness as "a psychiatric or psychological condition <u>regardless of cause</u> such as . . . depression . . ." (emphasis added).

## II. Defendant's second basis for denying plaintiff's claim

Next, defendant argues that plaintiff failed to show that he was receiving regular medical care for his disability as of February 19, 1998. This argument is baseless. To begin, there is no mention of a requirement of regular medical care under the policy's definition of disability. Such a requirement in a disability benefit policy would be unreasonable and illogical. As plaintiff aptly points out, if he had been involved in serious car accident on his way home from work and

10

became disabled as a result, defendant could not reasonably deny plaintiff coverage for lack of established regular medical care at the time he suffered his debilitating injury.[4]

In fact, defendant has taken the "regular medical care" language in the policy completely out of context. That language appears in the portion of the policy titled "claim information," which has five major sections. They are: (1) When do you notify UNUM of a claim?; (2) How do you file a claim?; (3) What information is needed as proof of your claim?; (4) To whom will UNUM make payments?; and (5) What happens if UNUM overpays your claim? Under the first section (When do you notify UNUM of a claim?), the policy states:

> We encourage you to notify us of your claim as soon as possible, so that a claim decision can be made in a timely manner. Written notice of a claim should be sent within 30 days after the date your disability begins. However, you must send UNUM written proof of your claim no later than 90 days after your elimination period.[5] If it is not possible to give proof within 90 days, it must be given no later than 1 year after the time proof is otherwise required except in the absence of legal capacity.

---

[4] Defendant responds to this point by reiterating its nonsensical argument that plaintiff was terminated by the Humana letter of February 19, 1998, and that at the moment he read that letter his status with the company can best be compared to that of a retired employee who is injured subsequent to his retirement. The court disagrees. Plaintiff was not retired on February 19, 1998; plaintiff was an active employee who worked a full day and a full week and then, once his pre-approved and long-planned vacation period began, received notice from his employer that five months down the line his employment agreement would not be renewed and that "to ease the transition" he was relieved of his clinical responsibilities effective immediately.

[5] The "Benefit Information" section of the policy states that:

> You must be continuously disabled through your elimination period. UNUM will treat your disability as continuous if your disability stops for 30 days or less during the elimination period. The days that you are not disabled will not count toward your elimination period. Your elimination period is the later of: 180 days; or the date your salary payments end, if applicable.

Likewise, "Elimination period" is defined as "a period of continuous disability which must be satisfied before you are eligible to receive benefits from UNUM."

11

Then, under the third section (What information is needed as proof of your claim?), the policy states in relevant part, "Your proof of claim, provided at your expense, must show: that you are under the regular care of a doctor...."

The court finds that there is only one reasonable interpretation of this portion of the policy: that, at the time a claim is filed (which, under the terms of the policy, can be as late as one year after the time proof is otherwise required), the claimant must show that he is under the regular care of a doctor. Applying this interpretation to the facts in the instant case, plaintiff's elimination period extended to the day his salary continuation payments ended, which was July 1, 1998. As a result, the policy required that plaintiff send defendant written notice of his disability claim no later than 90 days after July 1, 1998, which plaintiff did.[6] Further, at the time plaintiff filed that claim, the policy required him to show that he was under the regular care of a doctor, which plaintiff also did.

Consequently, the court need not address defendant's misguided attempt to show that plaintiff was not under the regular care of a doctor on February 19, 1998, because Ms. Chavis is not a "doctor" under the definition of that term in the policy. This is simply a veiled attempt to show that plaintiff was not actually disabled on February 19, 1998, because he was not receiving what defendant considers to be proper medical care at that point or for three months thereafter.

---

[6] Defendant does not claim that plaintiff filed his claim late and, even if defendant did make this claim, the policy would allow plaintiff another year from September 28, 1998, to do so if necessary.

12

Unfortunately for defendant, the definition of disability does not require claimants to show that they are under the regular care of a doctor.[7]

Likewise, the requirements for filing a claim under the policy do not require claimants to show that they have been under the regular care of a doctor since the day they became disabled. Instead, the policy requires only that plaintiff show he was under the regular care of a doctor at the time he submitted his benefit claim, which plaintiff did. If defendant did not believe that plaintiff was truly disabled as of the evening of February 19, 1998, defendant could have required plaintiff to be examined by a doctor of defendant's choosing in accordance with the policy. Defendant did not do this. In fact, defendant did not challenge plaintiff's claimed status as "disabled" at all. Instead, defendant contorted the meaning of its own policy in order to deny plaintiff's claim on a nonexistent technicality. For these reasons, the court finds defendant's second basis for denying plaintiff's claim completely unreasonable.

## **CONCLUSION**

The undisputed facts show that both reasons given by defendant for denying plaintiff's claim under the policy were arbitrary and capricious. Plaintiff was an active employee of Humana on February 19, 1998 (and therefore covered by the policy), and the policy did not require plaintiff to show that he was receiving regular medical care on that day. Because defendant offered no other basis for its refusal to grant plaintiff's claim, that claim should be awarded to plaintiff in full. Consequently, plaintiff's motion for summary judgment is granted

---

[7] The definition of disability under the policy states that, "[y]ou are disabled when [defendant] determines that: you are limited from performing the material and substantial duties of your regular occupation due to your sickness or injury; and you have a 20% or more loss in your indexed monthly earnings due to the same sickness or injury."

13

and defendant's cross-motion is denied. Defendant is ordered to pay plaintiff the benefits defendant unreasonably withheld, as well as all of plaintiff's reasonable attorney fees.

ENTER:    October 23, 2000

_____
Robert W. Gettleman
United States District Judge